UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
DIANA INGRAVALLO,

      Plaintiff,

-against-

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, as
Administrator of the Delta Airlines, Inc.,
Long Term Disability Group Policy,

      Defendant.

------------------------------------------------------- x

**MEMORANDUM AND ORDER**
Case No. 10-CV-5150 (FB)(JO)

*Appearances*:
*For Plaintiff*:
CARL E. PERSON, ESQ.
325 West 45th Street, Suite 201
New York, New York 10036-3803

MARC WHITEHEAD, ESQ.
5300 Memorial Drive, Suite 725
Houston, Texas 77007

*For Defendant:*
MICHAEL H. BERNSTEIN, ESQ.
MATTHEW P. MAZZOLA, ESQ.
Sedgwick LLP
125 Broad Street, 39th Floor
New York, New York 10004

**BLOCK, Senior District Judge:**

      Pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"),

Diana Ingravallo seeks judicial review of the denial of long-term disability benefits under

a policy administered by Hartford Life and Accident Insurance Company ("Hartford"). *See*

29 U.S.C. § 1132(a)(1)(B).   The parties cross-move for summary judgment on the

administrative record ("AR").[1] For the following reasons, Ingravallo's motion is granted and Hartford's is denied.

---

[1] The AR has been presented to the Court as Bates-numbered exhibits to the Declaration of Marsha L. Macko, a senior appeals specialist in Hartford's Appeals Unit.

**I**

Ingravallo worked as an "air import coordinator" for BDP International.  It is undisputed that her job was "sedentary," meaning that it required her to sit for most of the workday, with brief periods of standing or walking, and to occasionally lift or carry no more than 10 pounds of weight.  It is further undisputed that the job involved an 8-hour workday and a 40-hour work week.

Ingravallo participated in her employer's long-term disability plan, which was administered by Hartford.  The policy defined "disability," for the first 60 months of benefits as "*Injury* or *Sickness* [that] causes physical or mental impairment to such a degree of severity that *You* are . . . continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and . . . not gainfully employed."  AR 000007.[2]  The plan delegated to Hartford "sole discretionary authority . . . to determine [participants'] eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it."  AR 000024.

In 1996 or 1997, Ingravallo was diagnosed with relapsing-remitting multiple sclerosis ("MS").  In 2000 and 2003 her condition required hospitalization for intravenous administration of medication.  In both cases, she was able to return to work.  She gave birth to her first child at the end of 2004.

In May 2005, Ingravallo complained to her neurologist, Dr. Andreas

---

[2]After 60 months, the definition changed to "continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience."  AR 000007.  This case concerns only "own occupation" disability.

Neophytides, of difficult walking and urinary urgency.  Dr. Neophytides found new signs

of myelopathy[3] and again had Ingravallo hospitalized for intravenous medication.  The 2005

exacerbation led Dr. Neophytides to opine that Ingravallo was "no longer able to work in

any capacity," and to advise that she "retire from work on a permanent basis."  AR 000845.

Ingravallo followed her doctor's advice and applied for short-term disability

benefits.  In support, Dr. Neophytides submitted a "Medical Assessment Tool" noting

weakness and spasticity in the lower extremities, as well as incontinence.  To treat what he

described as "closely spaced exacerbations of myelopahy," he prescribed an

immunosuppressive and anti-inflammatory regimen consisting of daily injections of

Betaseron and monthly injections of Solumedrol; he also prescribed Lexapro to treat related

depression.  AR 001391.  On July 6, 2005, Hartford approved the application "to allow for

[treatment] of most recent flare-up and efficacy of med[ication]s."  AR 000212.

As her short-term benefits approached exhaustion, Ingravallo applied for long-

term benefits.  She reported weakness and numbness in her hands and legs; impaired

memory, vision and coordination; urinary urgency; fatigue; and depression.    Dr.

Neophytides submitted a "Functional Assessment Tool" in which he stated that Ingravallo

was not capable of full-time employment due to paraparesis (partial paralysis of the legs)

and incontinence.  He opined that Ingravallo would never be able to return to work because

---

[3]MS is a demyelinating disease in which the body's immune system attacks the myelin sheaths covering neurons in the brain and spinal cord.  This impairs the affected nerves' ability to function, which, in turn, can lead to numbness, weakness and fatigue, and deficiencies in vision, motor skills, cognitive ability and other bodily functions (such as bladder control).  *See Stedman's Medical Dictionary* 1733 (28th ed. 2006); *Encyclopedia of Medicine* 701 (Charles B. Clayman, M.D., ed., 1989).

her "moderately advanced" relapsing-remitting MS was "turning into secondary progressive" MS, a more serious stage of the disease in which many sufferers "begin continuously deteriorating" without remission. AR 000085, 000787. Based on this evidence, Hartford approved the application for long-term benefits. In addition, it offered Ingravallo assistance in applying for Social Security benefits. The Social Security Administration rendered a "fully favorable" decision on her application in August 2006. Hartford applied the Social Security benefits as an offset to the amount of benefits it paid.

Hartford reviewed Ingravallo's circumstances roughly once a year. In September 2006, Ingravallo reported "constant numbness [and] weakness" in her legs and "chronic fatigue." AR 001367. Dr. Neophytides added that she had complained of urinary urgency and difficulty walking, and that a physical exam had revealed signs of a spastic gait and hyperreflexia (overactive reflexes). He described Ingravallo's condition as "improved," but opined that she could stand or walk for no more than "several minutes" and could sit for no more than "[one] hour at a time." AR 000757. Hartford approved the continuation of benefits.

In October 2007, Ingravallo reported "constant fatigue" and "numbness in hands [and] legs [and] feet." AR 001319. She also reported the birth of her second child. Dr. Neophytides reported continuing signs of paraparesis and hyperreflexia, and newly observed "Babinski signs" in both feet.[4] Dr. Neophytides opined that Ingravallo could not

---

[4]A Babinski response occurs when the toes curve upward and fan out in response to stimulation of the sole of the foot; it is abnormal and suggests damage to the tract transmitting neural impulses from the brain to the spinal cord. *See Stedman's Medical Dictionary* 1766.

5

be expected to lift or carry any amount of weight, or to engage in activities that required reaching, fingering or handling, bending at the waist, or kneeling or stooping.  He also restricted her from driving.  Dr. Neophytides did not offer an opinion on Ingravallo's ability to stand, walk or sit, or the total amount of time she could do those activities in a day. Hartford nevertheless approved the continuation of benefits.

In October 2008, Ingravallo stated that her symptoms had become "worse" since the birth of her second child the previous year.  AR 001299.  She reported that she required assistance to dress, bathe and use the toilet.  Her husband and mother were responsible for cooking and taking care of the children. She further complained of cognitive difficulties handling money and her medication.  She stated that she was no longer able to work, cook or shop.  Dr. Neophytides continued to report hyperreflexia and Babinski responses; he opined that Ingravallo could sit for only two hours at a time, and could not stand or walk for any length of time.  He continued to opine that Ingravallo could not be expected to lift or carry any amount of weight, or to engage in activities that required reaching, fingering or handling, bending at the waist, or kneeling or stooping.  He did not report any signs of cognitive impairment.

Because Ingravallo reported needing assistance with daily activities, Hartford investigated whether she qualified for the plan's "catastrophic" disability benefit.  In that regard, it sought confirmation of her limitations from Dr. Neophytides.  Dr. Neophytides opined that Ingravallo did not require assistance in any daily activities.

The inconsistency between Ingravallo's and Dr. Neophytides's reports led Hartford to refer the claim to its Special Investigations Unit ("SIU").  As additional reasons

6

for the referral, Hartford noted that Ingravallo was "able to get pregnant and deliver a child in 10/07," and that her self-reported restrictions "appear[ed] extreme for [her] reported condition."  AR 001555.

Hartford's SIU placed Ingravallo under video surveillance.  A video taken on November 14, 2008, shows Ingravallo pushing a baby stroller from her home to a pharmacy two blocks away.  She returns approximately 90 minutes later, with several plastic bags hanging from the stroller.  A video taken on November 15, 2008, shows Ingravallo unloading grocery bags from the trunk of her car.  She returns to retrieve a toddler and, later, two plastic jugs.

Hartford concluded that the surveillance videos showed Ingravallo performing activities "outside of her self-stated limitations and her physician provided limitations."  AR 001559.  It assigned a claims examiner to conduct an in-person interview with Ingravallo. During the interview, which took place on January 28, 2009, Ingravallo was shown the surveillance videos.  She acknowledged that the videos were of her, and stated that they depicted her "normal/average level of functionality."  AR 001561-62.

At the conclusion of the interview, Ingravallo read, revised and signed a prepared statement summarizing her complaints and the limitations they imposed.  She stated that "a lot of pain in both legs" prevented her from standing or walking for more than 10-15 minutes, during which she estimated she could walk two blocks.  AR 001567.  She further complained of "pins and needles in [her] hands and feet," which limited her manual dexterity and prevented her from sitting for more than one hour, after which she needed to put her feet up to relieve "the tingling and numbness in [her] feet."  AR 001569.  She further

stated that she felt fatigued and napped during the day.  Finally, she stated that she did not see Dr. Neophytides "unless something is happening," AR 001573; the record confirms that her last visit was more than a year prior to the interview.

A medical case manager at Hartford reviewed Ingravallo's file, including the surveillance videos and Ingravallo's statement, and opined that Ingravallo "appears to have the ability to function up to 40 hrs per week in a sedentary capacity." AR 000124.  She asked Dr. Neophytides for his opinion.

Before responding, Dr. Neophytides saw Ingravallo.  In his notes of the visit, he reported that she was "doing quite well without any clinical exacerbation for a long time." AR 001174.  He opined that her MS was "stable" and that her depression/anxiety was "under control." AR 001175.  He ordered updated MRIs

In his response to Hartford, Dr. Neophytides stated that Ingravallo's MS had been "fairly quiescent," but that "there is something wrong with her gait" and that she "continues to feel fatigued and her stamina remains diminished." AR 001171-72.  He also reported that the updated MRIs had revealed "some improvement" in the demyelinating lesions on Ingravallo's cervical spine.  AR 001172.  By contrast, he observed that lesions on at the T1 level (i.e., at the top of the thoracic spine) had developed into "black holes," areas of total demyelination where the nerve cells are damaged beyond repair.  AR 001172.  He stated that "all neurological experts attest" that black holes "correlate well with the degree of a patient's disability." AR 001172.

Upon receipt of Dr. Neophytides's report, Hartford requested "peer review" by an independent neurologist.  Reviewing the file, Dr. Bruce Leforce concluded that

8

Ingravallo could sit "up to eight hours per day," stand and walk "occasionally," lift and carry "up to ten pounds occasionally," and exert "a negligible amount of force continuously." AR 001159. Accordingly, he opined that Ingravallo could "perform [a sedentary] level for work for up to 40 hours per week." AR 001159. Dr. Leforce noted that "[c]ranial nerve examination was normal," but did not comment on the extent of spinal demyelination Dr. Neophytides had observed. AR 001159.

On April 30, 2009, Hartford informed Ingravallo that it had concluded that she no longer met the definition of disability and that it would cease paying benefits as of May 1st. Hartford summarized its decision as follows:

> [T]he activities that you demonstrated during surveillance show you performing at levels in excess of your stated limitations and without visible difficulty or limitation. A functional assessment was performed indicating that you should be able to perform your own occupation in a full-time capacity. An Independent Record Review was completed and it was agreed that you were capable of performing your own occupation on a full-time basis. Utilizing the clinical information and the video surveillance it has been determined that you are no longer totally Disabled from Your Regular Occupation.

AR 000118.

Ingravallo administratively appealed the decision. In support, she submitted the notes of further visits with Dr. Neophytides. In a note dated May 28, 2009, Dr. Neophytides observed weakness and decreased sensitivity in the legs, a slightly spastic gait and the return of Babanski signs in both feet. His overall impression was "moderately advanced multiple sclerosis" with "recent exacerbation of thoracic myelopathy." AR 000239. He made essentially the same observations in a note dated December 10, 2009, adding that

there was some evidence of abnormality in Ingravallo's left eye.

In processing the appeal, Hartford ordered a second peer review.  Another neurologist, Dr. Arousik Varpetian, reviewed Ingravallo's file and concluded that as of May 1, 2009, she had "slight weakness" in her legs and a mildly spastic gait.  AR 000230.  He opined that "fatigue due to weakness" prevented Ingravallo from walking quickly or for longer than 30 minutes, and that "urinary urgency" required her to be near a restroom.  AR 000230.  Dr. Varpetian unsuccessfully attempted to speak to Dr. Neophytides, but he nevertheless agreed with him that Ingravallo's MS was "moderately advanced."  AR 000231.  That diagnosis, he opined, put her "at risk for developing significant fatigue and decompensation."  AR 000231.  He concluded, however, that "[d]ue to a lack of medical information to support an inability to work (Functional Capacity Evaluation) [Ingravallo] should be able to work at the sedentary leval from May 01, 2009 to the present."  AR 000231.

On February 18, 2010, Hartford upheld its decision to deny benefits.  It reasoned that "[n]o medical determination was provided which indicates that [Ingravallo] experienced a significant exacerbation/relapse or MS during the past two years," and that "there is insufficient evidence substantiating disabling levels of fatigue after 04/30/09."  AR 000097.  Hartford acknowledged that Ingravallo was still receiving Social Security benefits as of the date of its decision, but stated that "the Social Security Administration and The Hartford use different definitions of disability and different criteria for awarding or continuing to approve disability benefits."  AR 000097.

This action timely followed.

## II

Where an ERISA plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a denial of benefits by the administrator must be upheld unless it is arbitrary and capricious. *Kintsler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). A denial is arbitrary and capricious if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).

"[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115 (internal quotation marks, alteration and citation omitted). In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme Court held that a conflict of interest exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." *Id.* at 112. It then reaffirmed that such a conflict was a factor to be considered, and explained its importance would vary from case to case:

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

11

*Id.*  The Second Circuit has added that "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision."  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 140 (2d Cir. 2010).

Since Hartford both evaluated and paid claims, its decisions were made under the structural conflict of interest identified in *Glenn*.  Ingravallo has not offered any evidence of biased claims administration, while Hartford has offered undisputed evidence that its eligibility determinations are made without input from its underwriters by individuals who do not receive financial incentives to deny claims.  It uses third-party vendors, rather than Hartford employees, to perform peer reviews of medical evidence.  Ingravallo's appeal was not decided by the same person who initially denied continuation of benefits; indeed, the appeals specialist attests that she "did not discuss the claim with the [person] who make the initial benefits determination, or his supervisors."  Decl. of Marsha L. Macko ¶ 10.  This evidence mitigates the likelihood that the structural conflict of interest affected Ingravallo's claim.  *Accord Durakovic*, 609 F.3d at 140 ("[The district] court properly noted that the Funds' procedures provide many safeguards against bias." (internal quotation marks, alterations and citation omitted)).

The absence of "external" evidence of bias does not mean, of course, that the conflict played no role in Hartford's decision.  *See id.* at 140-41 ("But the [district] court did not seem to consider the Funds' decisionmaking deficiencies[. I]n light of them, the district court should have accorded the conflict more weight.").  But assessing the effect of the conflict, as evidenced by the decision itself, obviously requires the Court to address the merits of the decision.

As set forth below, the Court concludes that Hartford's decision was defective in three respects. It is not necessary for the Court to hold that these defects demonstrate that the decision was the product of a conflict of interest; it is sufficient to say that they render the decision arbitrary and capricious.

## A. Social Security Benefits

"A plan administrator making discretionary determinations as to eligibility is not bound by the determination of the Social Security Administration." *Rudolph v. Joint Indus. Bd. of Elec. Indus.*, 137 F. Supp. 2d 291, 300 (S.D.N.Y. 2001) (citing *Kunstenaar v. Connecticut Gen. Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir.1990)). It does not follow, however, that an award of Social Security benefits is irrelevant. The insurer in *Glenn* ceased paying benefits on the ground that the plaintiff was not disabled. It had previously assisted the claimant in obtaining Social Security benefits, and then "deducted the amount of those government benefits from the disability payments that it was obliged to pay." *Glenn v. MetLife*, 461 F.3d 660, 667 (6th Cir. 2006). The circuit court concluded that the insurer's actions had "two ramifications":

> The first stems from the fact that MetLife assisted Glenn in obtaining Social Security benefits and reaped a financial benefit of its own when that assistance was successful. The second issue relates to the fact that, in denying Glenn continuation of her long-term benefits, MetLife failed to address Social Security's contrary determination of Glenn's status. It is obvious that both factors are relevant in determining whether MetLife's decision was arbitrary and capricious.

*Id.* The Supreme Court endorsed the circuit court's reasoning, adding that "this course of events was not only an important factor in its own right (because it suggested procedural

unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous)." *Glenn*, 554 U.S. at 118.

Like the insurer in *Glenn*, Hartford benefitted from Ingravallo's Social Security award while it paid benefits. And like the insurer in *Glenn*, Hartford declined to give the Social Security Administration's determination any weight when it decided to stop paying benefits. The only difference is that Hartford offered a reason, while the insurer in *Glenn* did not.

Hartford reasoned that "the Social Security Administration and The Hartford use different definitions of disability and different criteria for awarding or continuing to approve disability benefits." AR 000097. The Court fails to see any meaningful difference between Hartford's definition—"*Injury* or *Sickness* [that] causes physical or mental impairment to such a degree of severity that *You* are . . . continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*," AR 000007—and the Social Security Administration's definition (applied at step four of the familiar five-step analysis) of "physical or mental impairment or impairments [that] are of such severity that [the claimant is . . . unable to do his previous work." 42 U.S.C. § 423(d)(2)(A). Indeed, since the Social Security Administration's definition goes on to require that the claimant not be able to "engage in *any other kind* of substantial gainful work which exists in the national economy," *id.* (emphasis added), it is more restrictive than Hartford's definition.

It is true, of course, that Hartford agreed that Ingravallo was disabled when the Social Security benefits were first awarded in August 2006. Like Hartford, however, the

Social Security Administration periodically reviews claims to determine whether benefits should be continued. *See* 20 C.F.R. § 404.1589 ("[W]e must evaluate your impairment(s) from time to time to determine if you are still eligible for disability cash benefits."). Although the record does not reflect whether any such "continuing disability review" was conducted for Ingravallo, it is undisputed that she was still receiving benefits as of February 18, 2010.

The Court repeats that Hartford was not required to follow the Social Security Administration's determination. But having reaped the benefit of the latter's finding of disability, Hartford should at least have offered a sensible reason for its change of heart.

Because the Court's review depends on many factors, *see Glenn*, 554 U.S. at 117 ('[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations . . . ."), it need not decide whether Hartford's failure to provide a cogent reason for its disagreement with the Social Security Administration would, standing alone, be fatal. Even without considering that factor, the Court concludes that other defects render Hartford's decision arbitrary and capricious.

**B. Conflicting Medical Evidence**

A major aspect of plan administrators' discretion is weighing conflicting evidence. Unlike the Social Security Administration, they are not required to give controlling or other special weight to the opinions of treating physicians. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Nevertheless, the manner in which conflicting evidence is addressed can render a decision arbitrary and capricious. In *McCauley v. First Unum Life Insurance Co.*, 551 F.3d 126 (2d Cir. 2008), the Second Circuit held that an insurer's "reliance on one medical report in support of its denial to the detriment of

15

a more detailed contrary report without further investigation was unreasonable." *Id.* at 138.

Here, Dr. Neophytides's assessment of Ingravallo's limitations was more restrictive than the assessments of Hartford's peer reviewers, Dr. LeForce and Dr. Varpetian. Hartford argues that Dr. Neophytides's assessment was appropriately discounted because he "deemed Ingravallo disabled not due to any current functional restrictions/limitations, but due to concerns that she might have another exacerbation in the future." Hartford's Mem. of Law 10.[5]

In the main, the Court agrees. However, Dr. Neophytides specifically noted the presence of "black holes" on Ingravallo's most recent MRIs and opined that "all neurological experts attest" that their presence "correlate well with the degree of a patient's disability." AR 001172. Dr. Leforce noted that his review of the medical records included the MRIs, but did not contradict Dr. Neophytides's assessment of their significance on Ingravallo's limitations. Dr. Varpetian did not mention them at all; indeed, he evidently based his opinion regarding Ingravallo's ability to work on a "lack of medical information." AR 000231.

The Court need not linger over whether Dr. Neophytides's assessment was "more detailed," *McCauley*, 551 F.3d at 138, in some abstract sense. The important point is that it raised an important detail that Hartford's peer reviewers did not address. Hartford's

---

[5]Ingravallo does not press the argument raised in her administrative appeal that Hartford is obliged to consider the likelihood of future exacerbations in determining disability. In any event, Hartford's position that an applicant must meet the definition of disability throughout the period during which benefits are paid is an altogether reasonable exercise of its discretion to interpret the plan's provisions.

decision to rely on the peer reviewers' assessments without first filling in the lacuna was arbitrary and capricious.

## C. Surveillance

Hartford's decision to stop paying benefits is ultimately traceable to the surveillance videos.  Those videos undoubtedly show Ingravallo doing things that she claimed not to be able to do.[6]  But Hartford's definition of disability depends on Ingravallo's ability to do work, not her ability to do chores.  *Cf. Murdaugh v. Sec'y of Dep't of Health & Human Servs.*, 837 F.2d 99, 102 (2d Cir. 1988) ("[A] claimant need not be an invalid to be found disabled under . . . the Social Security Act.").

To fulfill the requirements of her prior job, Ingravallo must, among other things, be able to sit for most of a workday.  The surveillance videos do not contradict her self-reported inability to sit for prolonged periods before she needs to elevate her feet.  More generally, Ingravallo must be able to perform whatever tasks her job requires—whether sitting, standing or walking—for eight hours a day and forty hours a week.  The Court concludes that the surveillance videos do not constitute substantial evidence that she is able to do so.

### III

The Court appreciates that relapsing-remitting MS affects different sufferers to different degrees.  *See Fortune v. Group Long Term Disability Plan for Employees of Keyspan*

---

[6]It is worth noting, however, that Ingravallo never sought the "catastrophic" disability benefit that would have paid for assistance with those activities.  The decision to investigate whether Ingravallo was eligible for that benefit was Hartford's alone.

*Corp.*, 637 F. Supp. 2d 132, 143 (E.D.N.Y. 2009) (upholding denial based on evidence that applicant "suffered from no objective functional limitations other than intermittent weakness"), *aff'd*, 391 F. App'x 74 (2d Cir. 2010). Moreover, it is, as its name suggests, a disease whose effects fluctuate over time. That being said, Hartford's conclusion that Ingravallo's condition had improved to such an extent that she was able, as of May 1, 2009, to perform sedentary work on a full-time basis was arbitrary and capricious.

Accordingly, Ingravallo's motion for summary judgment is granted; Hartford's motion is denied. Entry of judgment will be withheld pending determination of the amount of benefits due. By April 17, 2013, the parties shall advise the Court whether they are able to agree on that amount. [7]

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 29, 2013

---

[7]In her briefing, Ingravallo requested attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). Such a request must be made by separate motion within 14 days after entry of judgment. *See* Fed. R. Civ. P. 54(d)(2).